# EXHIBIT 3

# Allman & Petersen Economics, LLC

7677 Oakport Street, Suite 610  
Oakland, CA 94621  
(510) 382-1550  
(510) 382-1472 (FAX)

Phillip H. Allman, Ph.D.  
Jeffrey S. Petersen, Ph.D.

www.allmaneconomics.com

Pascal v. Concentra Inc.  
(Case No. 3:19-cv-002559-JCS, N.D. Cal)  
September 18, 2020  
Report of Plaintiffs' Statistical Expert Regarding Sampling Protocol

**Assignment**

1. I was retained by the Javitch Law Office and the Zimmerman Law Offices to develop a sampling protocol that will determine the probability that an individual (defined as a telephone number) gave "consent" to receive text messages from Defendant in this matter.

**Results in Brief**

2. A sample size of fifty for each subchannel is the first phase of the sampling protocol. The results of this analysis will specify the likely percentage of phone numbers in each subchannel that did not give consent to receive text messages. If the trier-of-fact determines that a certain percentage of the phone numbers in a subchannel needs to be non-consent for the subchannel to qualify for the class, I can utilize the sample of fifty to determine if it has conclusively been proven if that percentage has been exceeded. If the sample of fifty is not conclusive, I can determine the additional sampling that needs to be conducted to arrive at the conclusion of whether the percentage threshold is exceeded by the subchannel phone numbers.

**The Data and the Sampling Protocol**

3. There are 21,869 known telephone numbers that received text messages that are the subject of the litigation in this matter. Additional numbers are expected from the Text Recruit logs in the

future. Therefore, the "unit of analysis" for the sampling protocol are the telephone numbers. The purpose of the sampling protocol is to determine the probability that a telephone number had given consent to receive the text messages.

4. It is my understanding that Defendant claims there are different ways an individual may have given consent to receive text messages and these are labeled subchannels. It is also my understanding that Defendant will provide a list of these different methods of consent along with categorizing all telephone numbers into a mutually exclusive subchannel.

5. The purpose of the sampling protocol is to determine how many phone numbers from each subchannel need to be traced back to source documentation to determine if consent was given. The sampling protocol in this report does not propose a method for the process of tracing a phone number to source documentation to determine if consent was given.

6. A "sampling protocol" for this matter means that some phone numbers will be randomly selected and traced back to source documentation to determine if consent was given. These phone numbers are "the sample." A simple random sample method for each subchannel will result in an unbiased data set since each phone number will have an equal probability of being selected.[1] I can conduct the simple random sample upon receipt of the categorization of the phone numbers using the RAND function in Excel. This will assign each phone number a random number. The random numbers are then ranked to determine which numbers will be in the sample. I will subsequently send the selected phone numbers to Defendant to produce documents relating to those phone numbers.

7. The sample is then used to determine the probability that the other "non-sampled" phone numbers gave consent. This process is referred to as inferential statistical analysis, i.e. using a

---

[1] Kaye, David H. and David A. Freedman., "Reference Guide on Statistics," Federal Judicial Center, Reference Manual on Scientific Evidence, Third Edition, p.225.

sample to project to a larger population. The minimum randomly selected sample size required to make projections from a sample to a large population is thirty.[2]

8. The number of telephone numbers that will need to be sampled from each subchannel depends on the "tolerable error rate" determined by the trier-of-fact. This error rate determines the parameters of the population average for each subchannel. The population average refers to the percentage of phone numbers that did not give consent. The sampled phone numbers determine the sample average. The determination of the sample size is based on a desired level of confidence and the parameters that are needed for the population average. According to the *Reference Manual on Scientific Evidence*, a 95 percent confidence interval is widely accepted among scientists:

> Traditionally, scientists adopt the 95 percent level of confidence, which means that if 100 samples of the same size were drawn, the confidence interval expected for at least 95 of the samples would be expected to include the true population value.[3]

Therefore, the statistical analysis in this matter for determining sample size will utilize a 95 percent level of confidence.

9. The sample size also needs to consider the difficulty in obtaining the sample and this should be a factor in determining the tolerable error rate. If it is difficult to determine whether a phone number gave consent, then a higher error rate should be allowed. Smaller sample sizes are associated with a higher probability of error.

10. My recommendation based on all the aforementioned factors is to begin the sampling process by randomly selecting fifty telephone numbers from each subchannel to determine

---

[2] Source: McClave, James and Terry Sincich, *Statistics, 13th Edition*, Pearson: Boston, 2017, p.321.
[3] Diamond, Sheri Seidman, "Reference Guide on Survey Research," Federal Judicial Center, Reference Manual on Scientific Evidence, Third Edition, p.381.

whether they gave consent. Based on the result of this process, I can inform the trier-of-fact of the parameters of the population mean for each subchannel.

*An Example of the How the Sampling Protocol will Result in Useful Information for the Trier-of-Fact in Determining the Class Size*

11. Assume "Subchannel 1" and "Subchannel 2" both contain 2,500 telephone numbers. If the sample of fifty phone numbers from Subchannel 1 results in 47 phone numbers not giving consent, then the sample average is 94.0 percent non-consent. The margin of error defines the confidence interval for the population average.[4] In this example, the margin of error is 6.5 percent.[5] Therefore, the lower bound of the confidence interval is 87.5 percent (94.0 percent – 6.5 percent). Since the margin of error statistic was computed with a 95 percent level of confidence, there is a 97.5 percent probability that at least 87.5 percent of the phone numbers in Subchannel 1 did not give consent.[6] It is "97.5 percent" because a two-tailed method is used that divides 2.5 percent of the allowable error on both tails.[7] The most likely outcome for the population average is that approximately 94.0 percent of the phone numbers in Subchannel 1 did not give consent. Therefore, if the sample size is increased, the lower bound of the confidence interval should increase and approach 94.0 percent. For example, if 250 telephone numbers are sampled, it is likely that the lower bound will increase to 91.2 percent.

---

[4] Kaye, David H. and David A. Freedman., "Reference Guide on Statistics," Federal Judicial Center, Reference Manual on Scientific Evidence, Third Edition, p.245.
[5] Petersen, Jeffrey S. and Phillip Allman, "The Margin of Error on Damages Calculations Based on Sample Survey Data in Class Action Wage and Hour Cases," *Journal of Legal Economics*, Volume 25, No. 1-2, September 2019, page 140.
[6] Ibid., page 150.
[7] Freedman, David A., Robert Pisani and Roger Purvis. 2007. *Statistics, Fourth Edition*, New York: W.W. Norton & Company, Inc., page 381.

12. If the sample of fifty phone numbers from Subchannel 2 results in no one giving consent, then the sample average is 100 percent non-consent. The most likely result for the population average is a percentage very close to 100 percent. In other words, if all phone numbers in this subchannel were traced for a consent determination, the result would be a percentage very close to 100 percent. The sample size of fifty shows a definitive conclusion that the population average is at least 94.0 percent.[8] If this percentage is not sufficient to attain a consent determination for the subchannel, then the trier-of-fact will need to specify the percentage that is sufficient before I can determine the full sample size. For example, if the trier-of-fact determines that 98.0 percent is needed for class membership, then the sample would need to be increased to 150 telephone numbers if each number resulted in non-consent.

13. If a subchannel contains less than fifty phone numbers, they can all be traced to source documentation to determine if consent was given. No sampling would be required. Therefore, in the first round of sampling, the maximum number of phone numbers that would need to be traced for consent is based on the following formula: Number of Consent Categories x 50.

**Summary of Sampling Protocol**

14. In summary,

- Step 1: Randomly select fifty phone numbers from each subchannel to determine if consent was given. If a subchannel contains less than fifty phone numbers, determine consent for all numbers.

- Step 2: Trier-of-fact determines the threshold for the percentage of phone numbers that needs to be exceeded for a subchannel to qualify for inclusion in the class. Based on this

---

[8] The binomial test was utilized to compute this statistic. Freedman, David A., Robert Pisani and Roger Purvis. 2007. *Statistics, Fourth Edition*, New York: W.W. Norton & Company, Inc., page 259.

information, I can determine if further sampling needs to be conducted to make the consent determination.

- Step 3: Determine the full sample size for each subchannel that will determine with 95 percent confidence whether the percentage of non-consent phone numbers in that category exceed the threshold established by the trier-of-fact.

**Professional Qualifications**

15. My resume, fee schedule and list of trials and depositions in the last four years are attached as Exhibit A. I received a Ph.D. in economics from the University of Utah. My primary fields of expertise are statistics, survey methodology, labor economics, and forensic economics. My publications in the fields of statistics, survey methodology, labor economics, and forensic economics have been cited 134 times according to Google Scholar. I have publications in the following peer-reviewed journals: Journal of Legal Economics, Industrial Relations, Journal of Policy Analysis and Management, and the American Journal of Industrial Medicine. In addition, I am the co-author of a peer-reviewed book published by the W.E. Upjohn Institute for Employment Research.[9]

16. I am an adjunct associate professor of economics at St. Mary's College in Moraga, California. I teach managerial economics in the Master of Business Administration program. I am a former member of the Board of Directors of the American Academy of Economic and Financial Experts. My term as a board member was April 2017 to April 2020.

---

[9] Levine, David I., Frank W. Neuhauser, Richard Reuben, Jeffrey S. Petersen, and Christian Echeverria, *Carve-outs" in Workers' Compensation: An Analysis of the Experience in the California Construction Industry,* W.E. Upjohn Institute for Employment Research, Kalamazoo, MI 2003.

17. I have substantial expertise in projecting class-wide damages based on inferential statistical analysis, i.e. using a data sample to project to a larger population. My experience is in the form of academic qualifications and litigation consulting experience.

18. I am the lead author of a peer-reviewed journal article regarding statistical analysis in class action wage and hour cases. I am also the lead author of other peer-reviewed journal articles that utilize inferential statistical analysis as the basis of the conclusions of the study. These articles are listed below:

- "The Margin of Error on Damages Calculations Based on Sample Survey Data in Class Action Wage and Hour Cases," *Journal of Legal Economics*, Volume 25, No. 1-2, September 2019.

- "The Effect of the Intent to Retire at Age 70 or Older on Work Life Expectancy," *Journal of Legal Economics*, Volume 23, No. 2, April 2017

- "A Comparison of Health Outcomes Among Older Construction and Blue-Collar Employees in the United States," *American Journal of Industrial Medicine*, 1998, Volume 34, No. 3.

19. In the federal case titled *Kristal Nucci, et al. v. Rite Aid Corporation, et al.* (case no. 19-CV-01434-LHK), my sampling design and survey results were cited several times by the Honorable Judge Lucy H. Koh in an order granting class certification. For example, Judge Koh writes, "Dr. Petersen's expert report and the underlying survey also establish whether employees were required to purchase clothing is a classwide question subject to common proof."[10] In the federal case titled *Coleman v Brown*, I was designated as the sampling design and survey expert in a Special Master research team appointed by the Honorable Kimberly Mueller. My role was to

---

[10] *Kristal Nucci, et al. v. Rite Aid Corporation, et al.* Case no. 19-CV-01434-LHK. "Order Denying Motion to Strike and Granting Class Certification," page 19.

supervise the design and implementation of a survey to psychiatrists employed by the California Department of Corrections.

20. I have recently presented at five professional conferences of statisticians, damages experts and survey experts regarding conducting sampling design and projection of class-wide damages in class action wage and hour cases. I also recently gave a presentation to attorneys on sampling design based on the Supreme Court decision in *Tyson Foods v. Bouaphakeo*. The titles of the presentations and the conferences are listed below:

- "Statistical Evidence in Wage and Hour Class Actions Since Tyson Foods: Impact on Certification and Trial," Webinar hosted by Strafford Publications, June 2020

- "The Implications of Recent Legal Decisions for Survey Methodology in Class Action Wage and Hour Cases," Annual Conference of the Pacific Chapter of the American Association for Public Opinion Research, San Francisco, CA, December 2019.

- "Duran Duran: The Important Issues in the Two Duran Decisions for Surveys and Statistical Analysis," Western Economic Association Annual Conference, San Francisco, CA, June 2019.

- "The Margin of Error on Damages Calculations in Class Action Wage and Hour Cases," Allied Social Science Associations Annual Conference, National Association of Forensic Economics, Atlanta, GA, January 2019.

- "Survey Design and Analysis in Class Action Wage and Hour Cases," Annual Conference of the Pacific Chapter of the American Association for Public Opinion Research, San Francisco, CA, December 2018.

- "Using Surveys to Assess Damages in Class Action Wage and Hour Cases," 30th Annual Meeting of the American Academy of Economic and Financial Experts, Las Vegas, NV, April 2018.

20.  I have worked on 73 class action cases in determining the payments due the class members. In many of these cases I have also performed statistical analysis to assist the trier-of-fact in determining liability. The breakdown between plaintiff and defense retentions in these cases is 85 percent for plaintiffs and 15 percent for defendants. I have testified at trial for both plaintiffs and defendants in class action cases.

21.  I am prepared to testify to the contents of this report in deposition or at trial if called upon to do so. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

*[Signature: Jeffry S Peterson]*                                                                 9/18/20

_____                                       _____

Jeffrey S. Petersen, Ph.D.                                                                          Date