UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LAWRENCE PASCAL,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>CONCENTRA, INC.,<br><br>　　　　Defendant. | Case No. 19-cv-02559-JCS<br><br>**ORDER GRANTING CONCENTRA'S MOTION FOR SUMMARY JUDGMENT, DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, AND DISMISSING PLAINTIFF'S COMPLAINT WITH PREJUDICE**<br><br>Re: Dkt. Nos. 133, 135, 138, 142 |

## I.   INTRODUCTION

Plaintiff Lawrence Pascal brings a putative class action against Defendant Concentra, Inc. ("Concentra") under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227. Presently before the Court are the parties' cross-motions for summary judgment on the dispositive issue of whether the text message that Pascal received was sent using an automatic telephone dialing system ("ATDS" or "autodialer") within the meaning of the TCPA under *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163, 1173 (2021) ("*Duguid*"). Based on the undisputed facts, the Court finds that it was not and therefore GRANTS Concentra's summary judgment motion and DENIES Pascal's summary judgment motion. The Court does not reach the parties' *Daubert* motions.[1]

## II.   BACKGROUND

### A.   Factual Background

This case involves a text message ("the Text") that was sent by Concentra on May 13, 2019 and received by Pascal on his mobile telephone without his consent. Second Amended

---

[1] The parties have consented to the jurisdiction of a United States magistrate judge pursuant to 28 U.S.C. § 636(c).

Complaint ("SAC") ¶¶ 17-18. The Text stated:

> "Are you looking for a new career? Concentra is inviting physical therapists to interview for o/p ortho positions across CA and offering up to $10k in incentives for select locations. Grow your skills with opps for leadership, manual therapy cert. and student teaching. Let's talk today! Text STOP to end."

SAC ¶ 18. According to Pascal, "[t]he message that was sent to [him] was also sent simultaneously to 3,596 phone numbers that Concentra identified as belonging to physical therapists in California." Motion to Certify Class (dkt. 108) at 3.

The relevant facts relating to how Pascal came to receive the Text are undisputed. At all relevant times, Concentra used Textedly (www.textedly.com), a messaging application that allowed Concentra to conduct marketing campaigns whereby it sent identical recruiting text messages to groups of potential job applicants. Amended Declaration of Randall A. Snyder ("Amended Snyder Decl.") ¶¶ 53-54. Textedly is described in its Terms of Service as follows:

> Through the Platform and Services, Textedly provides notification and messaging services that allows paid subscribers to contact and send information to their user database through mobile text messaging services and other mobile communication systems. After purchasing a subscription to the Platform, you can create and send text marketing campaigns to advertise your various products and services or send informational alerts, reminders, notifications or confirmations. As part of the Services and Platform, Textedly provides businesses and organizations with a variety of tools to collect names, mobile phone numbers, email addresses, and other information on an opt-in basis and to help you import subscriber data. However, contact information may be imported only if your users have given you consent to receive a specified type of messaging from you. Further, Textedly does not initiate, send, or generate any messages for you; rather, the messages are initiated by you using our Platform at your sole discretion, subject to these Terms. For example, Textedly does not draft the content of your messages, control when the messages are sent or to whom, or provide or generate any phone numbers to be messaged through the Platform or Site. All of these functions must be manually performed by you and are not automated. Textedly cannot send any messages randomly or send recurring messages.

Declaration of Amy L. Pierce in Support of Concentra, Inc.'s Motion for Summary Judgment ("Pierce Decl."), Ex. A (TEXTEDLY00001).

As used by Concentra, there were four "essential steps" involved in using Textedly: "(1) store the list of telephone numbers; (2) enter the text message content; (3) select the time that the messages are to be broadcast to the stored list of cellular telephone numbers; and (4) activate the

automatic message transmission process to send the messages en masse." Amended Snyder Decl. ¶ 56. It is undisputed that "[t]he way in which [Concentra] used . . . Textedly . . . require[d] a database file to first be uploaded and stored in the application." *Id*. ¶ 70. Thus, "Concentra uploaded large lists of phone numbers as .csv files to Textedly, and then shortly thereafter, sent the same spam text message to hundreds or thousands of people based on their professional credentials and geographic location." Motion for Class Certification at 2-3. "For example, the message that was sent to Plaintiff was also sent simultaneously to 3,596 phone numbers that Concentra identified as belonging to physical therapists in California." *Id.* at 3 (citing Declaration of Mark Javitch in Support of Motion for Class Certification, Ex. 2 (Screenshot of Textedly Campaign View Page (CONCENTRA 00137)).

"Textedly Messaging Application uses the Microsoft® MySQL® relational database as its internal storage for uploaded cellular telephone numbers." Amended Snyder Decl. ¶ 75. "The cellular telephone numbers . . . are stored in the MySQL database in descending order by the value of the 'id' field . . . , which relates directly to the time the cellular number was added to the database." *Id.* ¶ 76. In other words, id numbers are assigned to telephone numbers sequentially as they are uploaded to or entered manually into Textedly and they are stored in that order. Plaintiff's Motion for Summary Judgment at 4 (citing Amended Snyder Decl. ¶¶ 75-78 & Ex. F thereto; Javitch Summary Judgment Decl., Ex. 10 (Textedly Messaging Log)). It is undisputed that Textedly does not change the order of the telephone numbers or determine when any number will be called. Further, the Textedly Message Log reflects that Plaintiff's telephone number (found at Row 865 of the Subscribers Table in the message log) was assigned such a sequential identifier in connection with its storage in the MySQL database and that it was also dialed in sequential order. *See* Plaintiff's Summary Judgment Motion at 17-18 (citing Javitch Summary Judgment Decl., Ex. 10).

**B.     Contentions of the Parties**

Concentra seeks summary judgment in its favor on the basis that the undisputed facts establish that it did not use an ATDS within the meaning of the TCPA under the Supreme Court's recent decision in *Duguid*. Pascal disagrees and seeks summary judgment that an ATDS *was* used

3

1  because telephone numbers are assigned unique ids that are sequential when they are uploaded or
2  manually added to Textedly and therefore, Textedly used a random or sequential number generator
3  to store telephone numbers within the meaning of the TCPA.

### III. ANALYSIS

#### A. Legal Standards Under Rule 56

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the movant has made this showing, the burden shifts to the party opposing summary judgment to designate "'specific facts showing there is a genuine issue for trial.'" *Id*. (citation omitted); *see also* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ."). "[T]he inquiry involved in a ruling on a motion for summary judgment . . . implicates the substantive evidentiary standard of proof that would apply at the trial on the merits." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 252 (1986). The non-moving party has the burden of identifying, with reasonable particularity, the evidence that precludes summary judgment. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).

A party need not present evidence to support or oppose a motion for summary judgment in a *form* that would be admissible at trial, but the *contents* of the parties' evidence must be amenable to presentation in an admissible form. *See Fraser v. Goodale*, 342 F.3d 1032, 1036−37 (9th Cir. 2003). Neither conclusory, speculative testimony in affidavits nor arguments in moving papers are sufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.,* 594 F.2d 730, 738 (9th Cir. 1979). On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant, *Scott v. Harris*, 550 U.S. 372, 378 (2007), but where a rational trier of fact could not find for the non-moving party based on the

record as a whole, there is no "genuine issue for trial" and summary judgment is appropriate. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

### B. The TCPA and *Duguid*

Pascal brings this action under 47 U.S.C. § 227(b)(1)(A)(iii), which makes it unlawful to "make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone service . . . . unless such call is made solely to collect a debt owed to or guaranteed by the United States[.]" The term "automatic telephone dialing system" is defined as "equipment which has the capacity-- (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1).

Prior to the Supreme Court's decision in *Duguid*, there was a split of authority as to "whether an autodialer must have the capacity to generate random or sequential phone numbers." *Duguid*, 141 S. Ct. at 1168. In *Duguid*, the Court held that it must. The plaintiff in *Duguid* brought a claim under the TCPA based on several login notification text messages he received from Facebook, which offers an "optional security feature that sends users 'login notification' text messages when an attempt is made to access their Facebook account from an unknown device or browser." *Id.* at 1168. The plaintiff, however, did not have a Facebook account and had not provided Facebook with his telephone number. *Id*. The plaintiff alleged that "Facebook violated the TCPA by maintaining a database that stored phone numbers and programming its equipment to send automated text messages to those numbers each time the associated account was accessed by an unrecognized device or web browser." *Id.* In support of this position, the plaintiff argued that the phrase "using a random or sequential number generator" in Section 227(a)(1)(A) modified only the verb closest to it – *i.e.,* "produce," and therefore, the fact that Facebook used a system that could both store telephone numbers and send messages to those numbers was sufficient to establish the use of an autodialer. *Id.* Facebook, on the other hand, took the position that the phrase modified both verbs that preceded it, that is, both "produce" and "store." *Id.* at 1169.

The Supreme Court agreed with Facebook, holding that "[t]o qualify as an 'automatic

5

telephone dialing system,' a device must have the capacity either to store a telephone number using a random or sequential generator or to produce a telephone number using a random or sequential number generator." *Id*. at 1167. The Court looked first to "conventional rules of grammar," reasoning that " '[w]hen there is a straightforward, parallel construction that involves all nouns or verbs in a series,' a modifier at the end of the list 'normally applies to the entire series.' " *Id*. at 1169 (quoting A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 147 (2012) (Scalia & Garner) (quotation modified)).  The Court noted that it "often applies this interpretative rule[,]" which "generally reflects the most natural reading of a sentence." *Id.* It concluded that applying this rule to Section 227(a)(1)(A) "produces the most natural construction, as confirmed by other aspects" of its text, including the fact that "the modifier at issue immediately follows a concise, integrated clause" and that the modifying phrase follows a comma after "store or produce telephone numbers to be called." *Id.* at 1169-1170.

The Court further found that "[t]he statutory context" confirms that the autodialer definition excludes equipment that does not "us[e] a random or sequential number generator." *Id.* at 1171. It pointed to prohibitions in Section 227(b)(1) "target[ing] a unique type of telemarketing equipment that risks dialing emergency lines randomly or tying up all the sequentially numbered lines at a single entity." *Id.*  It reasoned further, "[e]xpanding the definition of autodialer to encompass any equipment that merely stores and dials telephone numbers would take a chainsaw to these nuanced problems when Congress meant to use a scalpel." *Id.*  For example, the Court explained, a broad definition of autodialer "would capture virtually all modern cell phones, which have the capacity to 'store . . . telephone numbers to be called' and 'dial such numbers.' " *Id*.

The Court acknowledged that "as a matter of ordinary parlance, it is odd to say that a piece of equipment 'stores' numbers using a random number 'generator[,]' " but explained that "it is less odd as a technical matter[,]" pointing out that "as early as 1988, the U.S. Patent and Trademark Office issued patents for devices that used a random number generator to store numbers to be called later (as opposed to using a number generator for immediate dialing)." *Id*. at 1171-72. It then stated in a footnote as follows:

> Duguid argues that such a device would necessarily "produce"

6

> numbers using the same generator technology, meaning "store or" in § 227(a)(1)(A) is superfluous. "It is no superfluity," however, for Congress to include both functions in the autodialer definition so as to clarify the domain of prohibited devices. *BFP v. Resolution Trust Corporation*, 511 U.S. 531, 544, n. 7, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994). For instance, an autodialer might use a random number generator to determine the order in which to pick phone numbers from a preproduced list. It would then store those numbers to be dialed at a later time. *See* Brief for Professional Association for Customer Engagement et al. as Amici Curiae 19. In any event, even if the storing and producing functions often merge, Congress may have "employed a belt and suspenders approach" in writing the statute. *Atlantic Richfield Co. v. Christian*, 590 U. S. ——, ——, n. 5, 140 S.Ct. 1335, 1350, n. 5, 206 L.Ed.2d 516 (2020).

*Id.* at 1172 n. 7 ("Footnote 7").[2]

The Court rejected Duguid's argument that a broad definition of autodialer was consistent with Congress's intent in adopting the TCPA. *Id.* at 1172. It observed, "[t]hat Congress was broadly concerned about intrusive telemarketing practices . . . does not mean it adopted a broad autodialer definition." *Id.* Rather, "Congress expressly found that the use of random or sequential number generator technology caused unique problems for business, emergency, and cellular lines" and therefore, "the autodialer definition Congress employed includes only devices that use such technology, and the autodialer prohibitions target calls made to such lines." *Id.* (citing 47 U.S.C. § 227(b)(1)(A)).

### C. Cases Applying *Duguid* in this District

In the wake of *Duguid*, courts in this district have addressed what constitutes an autodialer

---

[2] The portion of the amicus brief cited in Footnote 7 describes "a dialer that the TCPA was presumably intended to encompass" set forth in U.S. Patent 4,741,028 (" '028 Patent"). It summarized that technology as follows:

> To recap, the '028 Patent discloses generating a sequence of telephone numbers that are stored in an array. Next, a random number generator is used to retrieve a corresponding telephone number from the array. That number produced from memory can be used to create a record for immediate dialing or stored in longer term memory for subsequent dialing. Consequently, a dialer implementing this technology could use a sequential number generator for storing 10,000 telephone numbers in an array in RAM. The dialer then uses a random number generator to produce the numbers (i.e., select, retrieve, and provide the number from memory) for immediate or subsequent dialing. The random number generator may also be involved in further storing the number (albeit in a different manner, i.e., in a file) for dialing at a later time.

FACEBOOK, INC., Petitioner, v. Noah DUGUID, et al., Respondents., 2020 WL 5549320 (U.S.), 20-21 at 20 ("PACE Amicus Brief").

7

under the TCPA in various factual contexts. For example, in *Hufnus v. DoNotPay, Inc.*, the plaintiff asserted TCPA claims based on text messages sent to him by defendant DoNotPay, but "[t]he platform DoNotPay used to contact Hufnus merely processe[d] phone numbers supplied by consumers while signing up for DoNotPay's services" and then store[d] these numbers in a random and/or sequential way; use[d] a random and/or sequential generator to pull from the list of numbers to send targeted text messages; and use[d] a random and/or sequential generator to determine the sequence in which to send messages." No. 20-CV-08701-VC, 2021 WL 2585488, at *1 (N.D. Cal. June 24, 2021). The court concluded that under *Duguid*, this was not sufficient to establish that an ATDS was used because "the platform only contact[ed] phone numbers specifically provided by consumers during DoNotPay's registration process, and not phone numbers identified in a random or sequential fashion." *Id.*

The court in *Hufnus* rejected the plaintiff's reliance on the statement in Footnote 7 that "an autodialer might use a random number generator to determine the order in which to pick phone numbers from a preproduced list." *Id.* (quoting 141 S. Ct. at 1172 n.7). It found that the plaintiff's argument "relie[d] on an acontextual reading of this line, both with respect to the footnote specifically and the opinion more generally." *Id.* In particular, the court in *Hufnus* found that "[a]s to the footnote, the Court employed the quoted line to explain how an autodialer might both 'store' and 'produce' randomly or sequentially generated phone numbers, citing to an amicus curiae brief from the Professional Association for Customer Engagement for support. That brief makes clear that the 'preproduced list' of phone numbers referenced in the footnote was itself created through a random or sequential number generator, differentiating it from the 'preproduced list' of phone numbers used by DoNotPay, which was created by consumers providing their numbers while signing up for DoNotPay's services." *Id.*

The *Hufnus* court found, "[m]ore generally, [that] Hufnus's reading of [F]ootnote 7 conflict[ed] with *Duguid*'s holding and rationale." *Id.* According to the court in *Hufnus*:

> The Supreme Court explained in *Duguid* that the TCPA's definition of autodialer concerns devices that allow companies "to dial random or sequential blocks of telephone numbers automatically," not systems, such as DoNotPay's, that randomly or sequentially dial numbers from a list that was itself created in a non-random, non-

8

sequential way. 141 S. Ct. at 1167. The Supreme Court also explicitly stated that its opinion in *Duguid* was intended "to resolve a conflict among the Courts of Appeals" about the types of devices that qualify as autodialers. *Id*. at 1168. And DoNotPay's platform is akin to the systems deemed to not qualify as autodialers by the Courts of Appeals with which the Supreme Court sided, because DoNotPay's system targets phone numbers that were obtained in a non-random way (specifically, from consumers who provided them). *See, e.g., Gadelhak v. AT&T Services, Inc*., 950 F.3d 458, 460 (7th Cir. 2020) (Barrett, J.) (holding that a system that "exclusively dials numbers stored in a customer database" does not qualify as an autodialer); *Glasser v. Hilton Grand Vacations Co., LLC*, 948 F.3d 1301, 1306 (11th Cir. 2020) (adopting a definition of autodialer that excludes equipment that "target[s] a list of debtors" or "target[s] individuals likely to be interested in buying vacation properties").

*Id.* Based on the court's conclusion that the platform DoNotPay used to contact Hufnus did not qualify as an autodialer under the TCPA, the court found that Hufnus's claim failed as a matter of law and dismissed his complaint without leave to amend. *Id.*

Similarly, in *Tehrani v. Joie de Vivre Hosp., LLC*, Judge Chen rejected the plaintiff's reliance on Footnote 7 in support of his claim that text messages he received from the defendant were sent with the use of an autodialer for the purposes of the TCPA. No. 19-CV-08168-EMC, 2021 WL 3886043, at *5 (N.D. Cal. Aug. 31, 2021). In that case, the plaintiff's claim that the messages he received were sent using an autodialer was based on the following theory:

> According to Mr. Tehrani, the italicized language above from [F]ootnote 7 recognizes that there is an autodialer in the following circumstance: [A] system uses a list of preexisting phone numbers (e.g., marketing contacts). It generates an index number using either a sequential number generator (e.g., 1001, 1002, 1003, etc.), or a random number generator, assigns the generated numbers to phone numbers from the list, and stores the information. The system can then select sets of numbers to automatically dial (e.g., calling numbers 1,001-2,000). . . . In other words, according to Mr. Tehrani, the number generator in the autodialing system (whether random or sequential) does not have to "create the phone numbers themselves." Mot. at 2 (italics in original); see also Mot. at 5 (contending that "the TCPA does not solely protect the public from autodialer devices that use number generators to create the phone numbers – the statute protects the public from autodialers that randomly or sequentially generate numbers 'to determine the order in which to pick phone numbers from a preproduced list' and 'then store those numbers to be dialed at a later time' ").

> Based on this autodialer theory, Mr. Tehrani asserts that an autodialer was used in his case, even though it is undisputed that the alleged autodialer used by Defendants did not have the capacity to generate random telephone numbers to call. In his proposed TAC, Mr. Tehrani

9

alleges as follows:

• To send text messages, "Defendants used TrustYou software." Prop. TAC ¶ 14.

• "The TrustYou system includes [an existing] contacts database that can store names, phone numbers, and other information." Prop. TAC ¶ 15.

• "The TrustYou system can generate sequential numbers and store these numbers in its customer database, to index contacts. When a mass texting campaign is initiated, the system can then automatically text customers in the stored, sequential order. In addition, or in the alternative, when a group of contacts is selected for a mass texting campaign, the system can generate sequential numbers to indicate the texting order, store the selected contacts in this sequential order, and then text the contacts in the stored order." Compl. ¶ 17 (emphasis added).

*Id.* at *2-3.

The court in *Tehrani* rejected the plaintiff's interpretation of *Duguid* for several reasons. First, it found that "as a textual matter, the 'number generator' (whether random or sequential) specified in § 227(a)(1)(A) implicitly refers back to a 'telephone number[ ]' – *i.e.*, the preceding phrase – and not to an index number." *Id.* at *4. In support of this reading of the provision, the court points to "subsection (B) which refers to the capacity to dial 'such numbers.' " *Id.* Therefore, the court concluded, "throughout § 227(a)(1), the term 'number[s]' refers to telephone numbers." *Id.*

Next, the court in *Tehrani* cited the fact that the Supreme Court in *Duguid* rejected not only the Ninth Circuit's reading of the TCPA but also that of the Second Circuit, which in *Duran v. La Boom Disco, Inc*., 955 F.3d 279 (2d Cir. 2020) "rejected the position that there is no autodialer if the system dials numbers from 'prepared lists – *that is, from lists that had been generated and uploaded to the programs by humans.*' " *Id.* (quoting *Duran v. La Boom Disco, Inc*., 955 F.3d at 283 (emphasis added in *Tehrani*)). The *Tehrani* court found that "[i]n rejecting the Second and Ninth Circuit holdings, the Supreme Court implicitly rejected Mr. Tehrani's interpretation of [*Duguid*]." *Id.*

The court in *Tehrani* found further support for its conclusion by looking to the circuit authority with which the Court agreed in *Duguid*. *Id.* According to the *Tehrani* court, "[t]hat authority indicates that the number generator must in fact create *telephone* numbers." *Id.* (citing

10

*Glasser v. Hilton Grand Vacations Co.*, 948 F. 3d 1301, 1307-09 (11th Cir. 2020) (noting that, "[a]t the time of enactment, devices existed that could randomly or sequentially *create telephone numbers* and (1) make them available for immediate dialing or (2) make them available for later dialing"; adding that it was not until 2003 that the FCC "issued a new order that interpreted § 227 to extend to equipment that *merely dialed numbers 'from a database of numbers'* – that merely stored numbers and called them") (emphasis added in *Tehrani*); *Gadelhak v. AT&T Servs.*, 950 F.3d 458, 460 (7th Cir. 2020) (noting that defendant's system "neither stores nor produces numbers using a random or sequential number generator; instead, it exclusively dials numbers stored in a customer database," and, therefore is not an autodialer for purposes of the TCPA)).

The court in *Tehrani* also found that the plaintiff's theory made "little sense when one takes into account the harms that the TCPA was intended to address" as described in *Duguid*, including "seizing the telephone lines of public emergency services [and] dangerously preventing those lines from being utilized to receive calls from those needing emergency services" and "simultaneously tie[ing] up all the lines of any business with sequentially numbered phone lines." *Id.* (quoting 141 S. Ct. at 1167). In light of these harms, the court found, "little would be gained by finding a TCPA violation based on a preexisting customer database." *Id.* at *5. For example, the court noted, "it is unlikely that a preexisting customer database would contain an emergency number; similarly, it is unlikely that a customer database would pose a danger to tying up business with sequentially numbered phone lines." *Id.*

Next, the *Tehrani* court rejected the plaintiff's reliance on the legislative history, finding that the history he cited was "not that informative" and pointing to the Supreme Court's conclusion in *Duguid* that "just because 'Congress was broadly concerned about intrusive telemarketing practices . . . does not mean it adopted a broad autodialer definition.'" *Id.* (quoting 141 S. Ct. at 1172).

The court in *Tehrani* also rejected the plaintiff's reliance on Footnote 7. It found the plaintiff's argument "problematic based simply on the fact that the Supreme Court did not take a clear-cut stance, with its final sentence in the footnote reading: 'In any event, *even if* the storing and producing functions often merge, Congress may have 'employed a belt and suspenders

11

1    approach' in writing the statute." *Id.* (citing 141 S. C.t at 1172 n.7 (emphasis added in *Tehrani*)).

2    More importantly, the court in *Tehrani*, like the *Hufnus* court, pointed out that the discussion in

3    the amicus brief upon which the *Duguid* Court relied in Footnote 7 made clear that the

4    "preproduced list" referenced in the footnote "was not some kind of pre-existing list but rather a

5    list of phone numbers that was generated by a number generator." *Id.* (citing PACE Amicus

6    Brief).

7    The court in *Tehrani* also pointed to a number of other district court cases in which courts

8    have interpreted Footnote 7 in a similar manner. *Id.* at *6-7 (citing *Hufnus*; *Barry v. Ally Fin.,

9    Inc.*, No. 20-12378, 2021 WL 2936636 at *6 (E.D. Mich. July 13, 2021) (stating that "Plaintiff

10   takes footnote 7 out of context"; "the 'preproduced list' of phone numbers referenced in the

11   footnote was itself created through a random or sequential number generator"); *Borden v.

12   efinancial, LLC*, No. C19-1430JLR, 2021 WL 3602479 at *5 (W.D. Wash. Aug. 13, 2021) (stating

13   that "Mr. Borden's argument relies on a selective reading of one line within footnote 7 and ignores

14   the greater context of that footnote and the opinion"); *Timms v. USAA Fed. Sav. Bank*, No. 3:18-

15   cv-01495-SAL, 2021 WL 2354931 at *7 (D.S.C. June 9, 2021) (holding that "footnote 7 does not

16   support Plaintiff's argument"; "the Supreme Court's statement – that an 'autodialer might use a

17   random number generator to determine the order in which to pick phone numbers from a

18   preproduced list' and 'then store those numbers to be dialed at a later time' – refers to the process

19   as explained by PACE on page 19 of its amicus brief")).

20   **D.    Discussion**

21   Based on the undisputed facts relating to Textedly's functionality, Plaintiff does not

22   dispute that the text messages at issue in this case were not "produced" "using a random or

23   sequential number generator." Instead, he contends the numbers were "stored" "using a random or

24   sequential number generator" by virtue of the fact that Textedly's MySQL database uses "a

25   sequential number generator to store telephone numbers and create[es] a unique identifier for each

26   entry." The Court rejects Plaintiff's theory, which it finds to be inconsistent with the reasoning

27   and holding of *Duguid*.

28   As discussed above, the court in *Tehrani* set forth a number of reasons for rejecting a

12

similar argument where the plaintiff argued that a feature that assigned sequential index numbers to telephone numbers that were input into the system for the purposes of storing the numbers in a database met the TCPA's definition of an autodialer. In particular, it found that under Section 227(a)(1), the requirement that a "number" must be stored or produced by an autodialer implicitly refers to a *telephone* number, citing the reference in subsection (B) to the capacity to dial "such numbers." 2021 WL 3886043, at *4. It pointed to other circuit authority cited with approval in *Duguid* reaching the same conclusion as further support for its conclusion. *Id.* (citing *Glasser v. Hilton Grand Vacations Co*., 948 F. 3d 1301, 1307-09 (11th Cir. 2020); *Gadelhak v. AT&T Servs*., 950 F.3d 458, 460 (7th Cir. 2020)). The undersigned agrees with the reasoning of *Tehrani* on this point and therefore concludes that the generation and assignment of random or sequential id. numbers to telephone numbers that were uploaded or manually input into Textedly, including Plaintiff's telephone number, is not sufficient to establish that an autodialer was used in sending the Text to Plaintiff.

More broadly, the Court agrees with both the *Hufnus* and *Tehrani* courts that under *Duguid*, a platform that merely targets telephone numbers that were obtained in a non-random way is not an autodialer for the purposes of the TCPA. *See Hufnus*, 2021 WL 2585488, at *1 (holding that use of an autodialer was not alleged where "the platform only contact[ed] phone numbers specifically provided by consumers during DoNotPay's registration process, and not phone numbers identified in a random or sequential fashion."); *Tehrani*, 2021 WL 3886043, at *4 (finding that *Duguid* Court implicitly rejected Second Circuit's holding in *Duran v. La Boom Disco, Inc*., 955 F.3d 279 (2d Cir. 2020) concluding that autodialer definition can be met by a system that dials numbers from "prepared lists – that is, from lists that had been generated and uploaded to the programs by humans."). This conclusion is supported by *Duguid*'s discussion of the purposes of the TCPA, as reflected in the language of the statute, which describes the specific harms associated with the use of autodialers; as the Court stated in *Duguid*, the "prohibitions [in Section 227(b)] target a unique type of telemarketing equipment that risks dialing emergency lines randomly or tying up all the sequentially numbered lines at a single entity." 141 S. Ct. at 1171. Those harms are not implicated by the system that was used here, where the messages were sent to

telephone numbers that were selected based on the geographical location and qualifications of the recipients.

Likewise, the undersigned agrees with the *Hufnus* and *Tehrani* courts that Footnote 7 does not support a contrary reading of *Duguid* and the TCPA.  Read out of context, the statement in Footnote 7 referencing an autodialer that "use[s] a random number generator to determine the order in which to pick phone numbers from a *preproduced list*" might suggest that even where a platform sends messages to a list of telephone numbers that was created in a non-random fashion, as is the case here, an autodialer is used if the order in which they are contacted relies on a random or sequential number generator.  As many courts have observed, however, the reference to a "preproduced list" in Footnote 7 was based on a specific technology described in the PACE Amicus Brief and that brief makes clear that the preproduced list was itself randomly generated. *See Hufnus*, 2021 WL 2585488, at *1;  *Tehrani*, 2021 WL 3886043, at *5;  2020 WL 5549320 (U.S.) (PACE Amicus Brief) at 19-21.   Moreover, even if the use of a random or sequential number generator to determine the order the messages would be sent could qualify a platform as an autodialer where the telephone numbers on the list were collected non-randomly, the definition would not apply to the facts here because it is undisputed that the numbers were stored and called in the same order they were uploaded or input into Textedly.

The Court further finds that Plaintiff's reliance on a handful of cases in which courts have denied motions to dismiss based on failure to allege use of an ATDS is misplaced.  *See* Plaintiff's Motion for Summary Judgment at 12 (citing *Miles v. Medicredit, Inc*., No. 4:20-cv-01186 JAR, 2021 WL 2949565, at*4 (E.D. Mich. July 14, 2021);  *Gross v. GG Homes, Inc*., No. 3:21-cv-00271-DMS-BGS, 2021 WL 2863623, at *1 (S.D. Cal. July 8, 2021);  *Callier v. GreenSky, Inc*., EP-20-CV-00304-KC, 2021 WL 2688622, at *5 (W.D. Tex. May 10, 2021)).  In these cases, the courts simply found that this issue was more appropriately addressed at the summary judgment stage of the case.

In *Miles v. Medicredit*, for example, the court found that the "newly clarified definition of an ATDS is more relevant to a summary judgment motion than at the pleading stage." 2021 WL 2949565, at *4 (quoting *Gross v. GG Homes, Inc*., No. 3:32-cv-00271-DMS-BGS, 2021WL

14

2863623, at *7 (S.D. Cal. July 8, 2021) (citing *Montanez v. Future Vision Brain Bank, LLC*, 20-CV-02959-CMA-MEH, 2021 WL 1697928, at *7 (D. Colo. Apr. 29, 2021)).  The court denied the defendant's motion to dismiss under Rule 12(b)(6), finding that the plaintiff had "pled enough facts to proceed with discovery, at which time he will have the opportunity to discover the precise technology that was used at the time of the alleged TCPA violation." *Id.*   It noted, however, that if the technology did not meet the statutory definition of an ATDS under *Duguid*, the defendant could move for summary judgment on that basis. *Id.*

Similarly, the court in *Gross v. GG Homes, Inc.*, declined to decide whether the defendant had used an ATDS, finding the question was more suitable for a decision on summary judgment. No. 321CV00271DMSBGS, 2021 WL 2863623, at *7 (S.D. Cal. July 8, 2021), on reconsideration, sub nom. KIMBERLY GROSS, Plaintiff, v. GG HOMES, INC., Defendant., No. 321CV00271DMSBGS, 2021 WL 4804464 (S.D. Cal. Oct. 14, 2021).  The court observed, "Plaintiff need not describe the technical details of Defendant's alleged ATDS at this stage. This issue is appropriately addressed following discovery and on a motion for summary judgment." *Id.*; *see also Callier v. GreenSky, Inc*., EP-20-CV-00304-KC, 2021 WL 2688622, at *11-12 (W.D. Tex. May 10, 2021) (holding that a pro se plaintiff's TCPA claim was sufficient at the pleading stage where he alleged that he received multiple calls, that there were several seconds of silence at the beginning of each call, that the same script was used for each call, and that an ATDS was used to place the calls).

*Carl v. First Nat'l Bank of Omaha*, No. 2:19-cv-00504-GZS, 2021 WL 2444162 (D. Me. June 15, 2021) and *Heard v. Nationstar Mortgage LLC*, No. 2:16-cv-00694-MHH, 2018 WL 4028116 (N.D. Ala. Aug. 22, 2018), cited by Plaintiff in his summary judgment motion, also do not support Plaintiff's position.  In *Carl*, the court declined to enter summary judgment on the ATDS question, concluding that there were factual disputes as to whether some of the calls received by the plaintiff were placed by an ATDS even though there was evidence that the platform at issue called numbers on a list that was provided by the defendant and was not randomly generated. 2021 WL 2444162, at *3, 9. In a footnote, the court noted that "*Duguid* suggested that an ATDS could potentially fall under [the] TCPA if it "use[s] a random number

15

generator to determine the order in which to pick phone numbers from a preproduced list [and] then store[s] those numbers to be dialed at a later time." *Id.* (citing *Duguid*, 141 S. Ct. at 1172 n.7). The court did not actually decide that question, however. In any event, the undersigned rejects this interpretation of Footnote 7 for the reasons discussed above.

In *Heard*, the court found that debt collection calls placed by the defendant fell within the definition of an ATDS where the defendant input call data from its loan files and the system software then sequenced and dialed the calls "according to a borrower's predicted availability to receive calls." 2018 U.S. Dist. LEXIS 143175, at *16 (N.D. Ala. Aug. 22, 2018). The court granted summary judgment in the plaintiff's favor, reasoning that "the fact that Nationstar employees 'scrub' and input loan data for the system's use does not obviate the role that Nationstar's iAssist software plays in selecting the numbers to call and initiating each call." *Id.* at *17. But *Heard* was decided before *Duguid* and it is likely that it is no longer good law. In any event, it is distinguishable from the facts here because it is undisputed that Textedly does not select the numbers to be messaged, change the sequence of the numbers that are entered into Textedly or determine the timing of the messages sent through its system.

Accordingly, the Court concludes, as a matter of law, that Concentra did not send the Text using an ATDS within the meaning of *Duguid* and the TCPA.

## IV. CONCLUSION

For the reason's stated above, Defendant's summary judgment motion is GRANTED. Plaintiff's summary judgment motion is DENIED. The case is dismissed with prejudice.

**IT IS SO ORDERED.**

Dated: December 14, 2021

JOSEPH C. SPERO
Chief Magistrate Judge

16